UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

       Plaintiff,

-vs-                                                 Case No. 13-20143
                                                      Hon. Avern Cohn

ALVIN RAY,

       Defendant.
_____

## SUPPLEMENTAL BRIEF
### IN SUPPORT OF *DEFENDANT'S MOTION TO SUPPRESS CONFESSION AND REQUEST FOR EVIDENTIARY HEARING* (Doc. 42)

The Defendant submits the following supplemental brief in support of his argument that his statements and involuntary confession at the police station should have been suppressed at trial for violating his *Miranda* rights

### SUMMARY OF THE EVIDENTIARY HEARING TESTIMONY

When the police raided Defendant Alvin Ray's home on August 23, 2012, they handcuffed him and the mother of his minor child, Cara Lee, placing them in the front room of the house while they processed evidence, and Ray and Lee's young son was playing outside. (Hearing Transcript, Vol. 1, 1/20/16, Doc. 111, Page ID 1173; cited hereafter in abbreviated format as "1/20/16 Pg ID 1173"). Ray was in custody thereafter for purposes of *Miranda*

analysis, handcuffed with Lee in the living room for about an hour-and-a-half. (1/20/16 Pg ID 1232, 1252).

Cara Lee testified at the evidentiary hearing that while she was next to Ray in the living room of their house at 9241 Genesee, Detroit, MI, and within Ray's hearing, she asked the police "Am I going to jail?", and an unidentified officer responded "We don't know yet." (1/20/16 Pg ID 1174-1175). In response to Lee's question, Lee testified that the officer said "There's enough guns here for both y'all," which was also within Ray's hearing in the living room. (1/20/16 Pg ID 1177).

Also within Ray's hearing while handcuffed in the living room together, Lee testified that two officers discussed the fact that Lee worked at the Wayne County Friend of the Court. (1/20/16 Pg ID 1175). Officer James Wiencek confirmed that Lee's employment came up in her conversation with the police, but he did recall the specifics of the conversations, but "we very often do speak" with suspects because it would be "normal" to have a conversation, "We're in people's homes." (1/20/16 Pg ID 1215, 1217).

When asked about the guns found in the house, Lee testified that she told the officers that the rifle in the basement belonged to her deceased uncle, and the rifle found in the upstairs bedroom closet belonged to her mother. (1/20/16 Pg ID 1178).

Lee testified that a Caucasian officer asked Ray about whether he had been to jail, and when Ray responded that he had been to federal jail, the officer said "Oh, we're going to see if we can get you some good time this time. You're selling drugs in my community. You are destroying my community." ( 1/20/16 Pg ID 1176).

Lee finally testified that in response to the conversation Lee was having with the police and the officer's statements, Ray said "She doesn't, she doesn't live here. She has nothing to do with this. Everything is mine. Don't ask her no more questions." (1/20/16 Pg ID 1177-1178). The police arrested Ray but let Lee remain at the house. (1/20/16 Pg ID 1179-1180).

Defendant Ray also testified at the evidentiary hearing. Ray stated that after being handcuffed and brought to the living room to stand next to Lee, he saw an officer bring a rifle up from the basement. (Hearing Transcript, Vol. 2, 1/21/16, Doc. 112, Page ID 1285; cited hereafter in abbreviated format as "1/21/16 Pg ID 1285"). Ray heard Lee ask either Officer Patrick Hill (later deceased) or Officer Gregory Robson whether she was going to jail. (1/21/16 Pg ID 1285-1286).

Officer Wiencek was standing nearby to Ray and Lee in the living room. (1/21/16 Pg ID 1287). Wiencek asked Ray if he had ever been to jail before, and Ray said he had been to federal prison. (1/21/16 Pg ID 1288). Wiencek responded by saying "Well, good. We found enough guns in here for you to be gone a long time this time." (1/21/16 Pg ID 1289).

Wiencek then asked "whose guns are these?" directed to both Ray and Lee, and neither Lee nor Ray responded. (1/21/16 Pg ID 1289). Wiencek then said "if no one wants to answer, then both of you are going to jail" (1/21/16 Pg ID 1290); whereupon, Ray said "Those are my guns. Ms. Lee has nothing to do with nothing in here. Just let her go." (1/21/16 Pg ID 1291).

Wiencek and Ray then talked about Ray destroying the community by selling drugs, and that Wiencek paid child support but Ray did not. (1/21/16 Pg ID 1293). Some officer made a comment that maybe Lee could help Wiencek with his child support payments—because she worked at the Friend of the Court—and Ray said "I don't think so." (1/21/16 Pg ID 1293). And

those comments then brought on a conversation between Ray and Wiencek about child support payments, Wiencek asked if Ray paid with drug money, and Ray responded by saying "However I pay it, I pay it." (1/21/16 Pg ID 1293- 1294).

Ray explained that he admitted ownership and knowledge of the firearms found in the house because he was afraid that Lee would be arrested, that she would lose her job, that she would be dragged out of the house in handcuffs in front of their son, and that their son would be placed in the care of the state while the case was pending. (1/21/16 Pg ID 1292).

Officers Hill and Robson were both present while Ray was talking to Weincek in the living room. (1/21/16 Pg ID 1297). About 15-20 minutes after admitting that the firearms were his, the police took Ray to the police station. (1/21/16 Pg ID 1296). It took the police about 10 minutes to take Ray to the Second Precinct. (1/21/16 Pg ID 1297-1298). Ray was fingerprinted and placed in a holding cell before being taken to an interrogation room. (1/21/16 Pg ID 1297-1298). The total time from Ray admitting to possessing the shotgun at the house to his being brought into the interrogation room at the police station was about 42 to 47 minutes. (1/21/16 Pg ID 1297-1299).

Officers Hill and Robson, who were present in the living room at the house, interrogated Ray at the station. (1/21/16 Pg ID 1299). The officers gave Ray a *Miranda* rights form and only asked him if he knew how to read and right. (1/21/16 Pg ID 1303). The officers also asked Ray to sign and initial the form; however, while Ray initialed the form, the officers continued talking to him, asking him questions that they said were "off the record." (1/21/16 Pg ID 1300, 1303). Because the officers were talking to him and questioning him before he had finished initialing the *Miranda* form, Ray did not actually read the form. (1/21/16 Pg ID 1303, 1312). Ray also

asserted that he only signed the Miranda form at the officer's insistence, after the interrogation ended. (1/21/16 Pg ID 1314).

During the interrogation, Ray again admitted that the shotgun and marijuana was his (not the other firearms) because he had already admitted to it earlier at the house, and because he was afraid that if he denied possession now, the police would retaliate by arresting and charging Lee. (1/21/16 Pg ID 1306).

At the hearing, the Government challenged Ray's testimony about which officer had the conversation with Lee about the possibility that she may go to jail, suggesting that Ray had identified Officer Hill at the trial, but that Ray had identified Officer Wiencek at the hearing. (1/21/16 Pg ID 1308). However, that inconsistency does not address whether or not the conversation actually occurred. Throughout the evidentiary hearing, the police officers' testimony was equivocal or lacking in recollection regarding whether the statements were made at the house:

1. Officer Robert Dale admitted that the police spoke with Lee and Ray, that Officers Hill and Robson spoke to Ray, that although Dale did not **hear** any questions about the guns or threats, he left open the possibility that someone did ask about who owned the guns. (1/20/16 Pg ID 1193-1194, 1199).

2. Officer James Weincek admitted that he was in the living room with Ray and Lee, that he recalled "casual conversation" between Ray and another officer but it was not about the case, that he did not **recall** anyone admitting possession of the firearms, that he did not **hear** anyone ask Lee questions, that he did remember that the subject of Lee's employment arose, and Weincek admitted that "we very often do speak" with suspects

because it would be "normal" to have a conversation, "We're in people's homes." (1/20/16 Pg ID 1204-1205, 1210, 1215, 1217).

3. Officer Jeffrey Pacholski saw Officers Hill and Robson talking to Ray and Lee in the living room, and he could not say whether or not were engaged in any conversation. (1/20/16 Pg ID 1223-1224, 1228-1229).

4. Officer Gregory Robson admitted that he had a conversation about Ray's son and the fact that Lee worked at the Friend of the Court. (1/20/16 Pg ID 1239). Robson also admitted that it was **possible** that someone asked Ray who the guns belonged to, that he could not **recall** if Lee asked whether she would be arrested, that he could not **remember** if Ray admitted to owning the guns, that he could not **recall** if Lee was concerned about her job. (1/20/16 Pg ID 1248-1249, 1251).

5. Officer Jason Sloan testified that he was in the living room with Ray and Lee for over an hour. (1/21/16 Pg ID 1261). Sloan said that he talked to Ray about the weather and Ray's statement that he thought the police were there to raid the house across the street that was selling heroin. (1/21/16 Pg ID 1263). Sloan stated that he did not ask substantive questions to Ray or Lee and that he did not **hear** any questions asked, and he did not **recall** if anyone asked Ray about being on federal probation or if Lee asked if she was going to jail. (1/21/16 Pg ID 1263-1266, 1271, 1275-1276). Finally, Sloan admitted that he could not answer whether or not anyone asked Lee about who the guns belonged to. (1/21/16 Pg ID 1276-1277).

The above summary of the Government's witness testimony does not counter Ray's assertions that he heard an officer make a statement about there being enough firearms to charge both Lee and Ray, that Lee was concerned about being arrested and losing her job, and that Ray admitted that the firearms were his. There was never a time when one officer was always with Ray and Lee together.

I. **CONTINUOUS INTERROGATION AND MID-STREAM *MIRANDA* WARNINGS**.

Defendant, Alvin Ray, appealed his conviction after a jury trial, and the US Sixth Circuit Court of Appeals remanded on the issue of the voluntariness of Defendant's confession. *United States v Ray*, 803 F3d 244 (6th Cir. 2015). In *Ray*, the Court of Appeals adopted the US Supreme Court's test in *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), which addressed the admissibility of post-*Miranda* admissions relating to statements made by a defendant prior to receiving *Miranda* warnings:

> Under the multi-factor test, the admissibility of statements given after midstream *Miranda* warnings hinges on whether "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Seibert*, 542 U.S. at 616 (plurality opinion). The factors identified by the plurality as relevant to this inquiry are "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id*.

*United States v Ray*, 803 F3d 244, 272-73 (6th Cir. 2015).

Here, the police admitted that Ray was in custody the entire time at the house, handcuffed with Lee in the living room for about an hour-and-a-half, without being read their *Miranda* rights. (1/20/16 Pg ID 1232, 1252).

*Miranda* warnings are required when a suspect is in custody and subject to interrogation. *Miranda* defined custody as the "[deprivation] of ... freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "Interrogation" means "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed. 2d 297 (1980).

A statement made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights "voluntarily, knowingly and intelligently." *Colorado v. Spring*, 479 U.S. 564, 572, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987)). A voluntary waiver is one that is "the product of a free and deliberate choice rather than intimidation, coercion, or deception;" it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). The crucial inquiry is not whether the defendant "knew and understood every possible consequence of a waiver," but, instead, "whether he knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009)). To determine whether a waiver is valid, the trial court must examine the totality of the circumstances. *Fare v. Michael C.,* 442 U.S. 707, 724, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979).

Here, Ray was handcuffed for about an hour-and-a-half while the police searched his house, allowing him to see the guns and drugs that were discovered, and while being questioned

and having conversations about ownership of the guns and drugs, Lee's status at work, Ray's prior record, the possibility of Lee being arrested because of the evidence found, and while Ray's son was outside. Ray's statements made at the house were made involuntarily, he was not read his *Miranda* rights, he was in custody, and he was subject to "express questioning or its functional equivalent." *Innis*, *supra* 446 U.S. at 300–301.

The analysis proceeds to the effect that the later "mid-stream" *Miranda* warnings at the police station may have had.

In *Missouri v. Seibert*, 542 U.S. 600, 615, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court suppressed the defendant's statements made after *Miranda* warnings because they were involuntarily made and tainted by prior pre-*Miranda* statements. *Id*. at 604-605. In *Seibert*, the police interrogated the defendant for 30 to 40 minutes, obtained a confession, took a 20 minute break, returned and gave *Miranda* warnings, and then continued to question the defendant about her pre-*Miranda* statements to get her to repeat the confession. *Id*. at 604–05, 124 S.Ct. 2601. The Court held that the mid-interrogation *Miranda* warning did not comply with *Miranda's* constitutional warning requirement because the interrogation was nearly continuous and the warnings were intentionally withheld in order to procure a confession. *Id*. at 617.

As discussed in the above factual summary, only about 42 to 47 minutes passed from the time that Ray admitted to possessing the shotgun and marijuana to the time the police started the interrogation at the Second Precinct. (1/21/16 Pg ID 1297-1299). At the post-*Miranda* interrogation, Ray involuntarily made the same admissions that he had made at the house earlier. Ray testified that he did not actually read the *Miranda* rights form because Officers Hill and

Robson began questioning him immediately while insisting that he initial and sign the form. (1/21/16 Pg ID 1300, 1303, 1312-1314).

Ray complied with the officers' demand to initial and sign the *Miranda* form and admit guilt because he was still under the same coercive pressure to take responsibility that existed at the house: Ray was afraid that Lee would be arrested, that she would lose her job, that she would be dragged out of the house in handcuffs in front of their son, and that their son would be placed in the care of the state while the case was pending, that he had already admitted to the same guilt earlier at the house, and because he was afraid that if he recanted his admissions at the interrogation, the police would retaliate by arresting and charging Lee. (1/21/16 Pg ID 1292, 1306). A "reasonable person in the suspect's shoes could [not] have seen the station house questioning as a new and distinct experience. *Seibert*, *supra* 542 U.S. at 616 (plurality opinion). And the *Miranda* warnings could not have made sense as "presenting a genuine choice whether to follow up on the earlier admission." *Id*. As Ray testified, he believed he had no choice.

Regarding the remaining *Seibert* factors, Ray gave a complete confession and statement at the house by stating that the shotgun and marijuana was his—while handcuffed and perceiving the threat of Lee's arrest; Ray's statement at the police station interrogation was the same; the post-*Miranda* interrogation took place just 42 to 47 minutes after the admissions at the house and involved the same two officers (Hill and Robson), who he spoke to at the house; and, the two interrogations were continuous because they were close in time, involved the same police personnel, and involved the very same subject matter.

Those factors weigh in favor of suppressing the second statement that was tainted by the first involuntary statement made without *Miranda* warnings.

Finally, Ray and Lee's account of the conversations that took place at the house are far more credible than the police accounts, which admitted the possibility that those conversations occurred and that no one officer was continuously with Ray and Lee. Ray's assertion that those conversations took place is consistent with the circumstances and setting of the situation: the police raided the house, and Ray and Lee were arrested and handcuffed in their house where firearms and drugs are found while their son is outside playing. It is natural that the subject of any conversation would be about whether or not Lee would be arrested, where Lee worked and whether she could be fired, who owned the firearms, and Ray's prior record. The fact that the police did not arrest Lee is also consistent with Ray admitting that the shotgun and marijuana belonged to him because there was no other reason to let Lee go free. Lee lived at the house and had multiple ties to it, she was in the bedroom where the police found marijuana, and she was present and near the shotgun behind the bedroom door just as Ray was.

Regarding the decision to allow Lee to go free at the house, Officer Sloan testified that the police did not have an arrest warrant, just a search warrant. (1/21/16 Pg ID 1272). The police did not have an arrest warrant because the only information the police had before executing the search warrant was that someone sold marijuana to a confidential informant at the house. (1/21/16 Pg ID 1272-1274). The police did not know who sold the marijuana, nor did they know who else was in the house and what knowledge or involvement any other person may have had about the alleged drug sale. (1/21/16 Pg ID 1272-1274).

In contrast to Ray and Lee's credible description of the conversations that took place, Officer Weincek testified that it is common for the police to have "casual conversation" with arrested suspects like Ray and Lee about "the weather, sports, just basically

conversation." (1/20/16 Pg ID 1205, 1217). At trial, Officer Sloan testified that "In this very case you are there for a hour or two so there is conversation that, wow, I can't believe how hot it is. Mr. Ray says, and I heard him say it, I thought you were coming to hit the house across the street because they sell heroin and they are banging. So you are laughing. It's kind of a meet-and-greet, for lack of a better term, but not the right place or the time for any questions regarding the case." (Trial Tr. 2, Doc 90, Page ID 808).

That is, the Government wants this Court to believe that it would have been natural and likely for any conversation that took place—while Ray and Lee were handcuffed in their living room, facing the fireplace wall, as the police searched the house finding firearms and drug— would have been about the weather and sports and involved laughter.

The Government did not meet its burden of showing by a preponderance of evidence that Ray's Miranda waiver was voluntary. *United States v Ray*, 803 F3d 244, 270 (6th Cir. 2015) (citing *Seibert, supra* 542 U.S. at 608 n.1 ("[T]he burden of showing admissibility rests, of course, on the prosecution. The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver, and the voluntariness of the confession." (alteration in original) (citations and internal quotation marks omitted)).

II. **HARMLESS ERROR ANALYSIS**.

In *United States v Ray*, 803 F3d 244 (6th Cir. 2015), the Sixth Circuit remanded for determination of whether Ray's post-*Miranda* statement should have been suppressed at trial. *Id*.

at 270. However, the Court of Appeals did not address the remedy if this Trial Court finds that Ray's statement should have been suppressed because it was involuntary.

It is the Defendant's argument that because he was in custody and effectively interrogated at his house, the failure of the police to read his *Miranda* rights violated his rights under the Fifth and Fourteenth Amendments to the US Constitution; additionally, the fact that the police read his *Miranda* rights "mid-stream" did not cure the earlier violation; and finally, that Ray's first statements at the house and his later post-*Miranda* statements at the station were both made involuntarily—the second post-*Miranda* statement being tainted by the first statements at the house.

The admission of an involuntary confession is subject to harmless error analysis. *Arizona v. Fulminante*, 499 US 279, 310; 111 S Ct 1246; 113 L Ed 2d 302, 331-32 (1991).

Federal Rule of Criminal Procedure 52 reads in relevant part as follows:

(a) Harmless error. Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

*  *  *

Fed. R. Crim. P. 52.

In this case, the Defendant preserved this issue for review by filing a motion to suppress before trial. (Doc. 42, 10/23/13).

"When an error of constitutional magnitude occurs, **the government must prove beyond a reasonable doubt that the error did not affect the verdict.**" *United States v Kilpatrick*, 798 F3d 365, 378 (6th Cir. 2015)(citing *United States v. Miner*, 774 F.3d 336, 342, 350 (6th Cir. 2014))[emphasis added].

'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Hart v. AG for Fla.*, 323 F.3d 884, 895 (11th Cir. 2003) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87, 84 S. Ct. 229, 230, 11 L. Ed. 2d 171 (1963)). In making this determination, the court must inquire into "(1) the effect of the erroneously admitted statement upon the other evidence introduced at trial, and (2) upon the conduct of the defense." *Id*.

In *Hart v AG*, 323 F3d 884 (11th Cir. 2003)(a habeas case requiring greater deferential review), the defendant and four co-defendants were indicted for the armed robbery of a private modeling and photography club which led to the deaths of two victims. *Id*. 886. Each defendant was charged with two counts of first degree murder, armed robbery, burglary with assault or battery therein while armed, unlawful possession of a firearm while engaged in a criminal offense, and the armed kidnapping of a model at the club, who was the only witness and survivor of the armed robbery. *Id*.

The police obtained defendant Hart's confession and admissions, and the Eleventh Circuit Court of Appeals held that the state police mislead the defendant as to the nature of his *Miranda* rights, making his waiver involuntary, and that admission of the defendant's statement violated his right against self-incrimination. *Id*. at 890-891, 896.

The *Hart* Court also held that the admission of the defendant's involuntary statement was not harmless error, and the Court's analysis of the facts was as follows:

> In this case, there is definitely a "reasonable possibility" that Hart's statement contributed to his conviction. At Hart's trial, the prosecution introduced Hart's statement into evidence both through [officer] Schuster's testimony and by playing a tape recording of the statement for the jury. The prosecution also presented the testimony of a police expert to contradict the portion of Hart's statement in which he denied shooting the victims. The

police expert testified that the physical evidence on the pillow retrieved from the crime scene indicated that all of the shots fired at [the victim] were fired in rapid succession without removing the muzzle of the rifle from the pillow. This contradicted Hart's statement that he deliberately missed, and [co-defendant] Leonard later fired the shots that killed [the victim]. The only evidence the prosecution presented to link Hart to the murders which was not related to Hart's statement was a fingerprint which was found on the outside of the door to [the club]. The fingerprint only established that at some time Hart had touched the outside of the door to [the club]; without Hart's statement, it was insufficient to establish his guilt. Aneschka Culmer, the only eyewitness, did not testify. Hart's four co-defendants also did not testify. In short, there is a high probability, much less a "reasonable possibility," that the evidence complained of contributed to Hart's conviction, and the introduction of Hart's statement therefore was not harmless error.

The introduction of Hart's statement likewise had a significant effect on the conduct of the defense. The admission of Hart's statement led his attorney to present a defense based on coercion and duress. He called a neuropsychologist to explain how Hart's background and psychological problems made it easy for Hart to be intimidated and controlled by Leonard. Hart also testified about his relationship with Leonard and explained his version of the events surrounding the murders. The fact that this testimony would have been unnecessary if the prosecution had not been allowed to present the unlawfully obtained statement is further evidence that the admission of the statement was not harmless error.

*Hart v AG*, 323 F3d 884, 895-96 (11th Cir. 2003).

Similarly in this case, the Government relied upon Ray's post-*Miranda* statement at trial. At trial, Officer Robson testified that Ray stated that he held a birthday party the night before the raid, that he sold marijuana for two months, that he had lived at 9241 Genesee for ten years, that the shotgun belonged to him but not the other firearms—which belonged to his girlfriend's uncle and mother—and that the cocaine in the closet was left by a friend the night before. (Trial Tr. 1, Doc. 89, Page ID 691-695). The government also showed the jury the signed and initialed *Miranda* form as an exhibit. (Miranda Form, Doc. 24-4, Page ID 67-68). Defendant Ray was then compelled to take the stand and testify in order to explain that he gave an involuntary and

Page 15 of 19

false confession at the police station because of the earlier admissions he made at the house in response to his custody and interrogation. (Trial Tr. 3, Doc. 91, Pg ID 958-963).

Not only that, but Officer Pacholski testified at the trial that while Ray was in custody at the house, he admitted to living there for the last 10 years without receiving his *Miranda* warnings. (Trial Tr. 2, Doc. 90, Page ID 780). And Officer Robson supported that testimony by telling the jury that Ray again admitted to living at the Genesee house for the last 10 years when he was later interrogated at the police station. (Trial Tr. 1, Doc. 89, Page ID 693). That testimony solidified the impression that Ray's post-*Miranda* statements were true and voluntary because of that type of additional consistency apart from the direct admissions.

Additionally, the Court of Appeals found that "A rational trier of fact could not have found that Ray possessed the 12-gauge shotgun or the .22 caliber rifle 'in furtherance of' drug trafficking." *United States v Ray*, 803 F3d 244, 263 (6th Cir. 2015). However, the reason that the jury found Ray guilty of that offense was because of the Government's use of his post-*Miranda* confession. Without that confession, "a rational trier of fact" could not have found Ray guilty of that offense; and in fact, the Court of Appeals new about Ray's post-*Miranda* confession and held that possession in furtherance could not be found. *Id*.

The jury convicted Ray because "A confession is like no other evidence." *Arizona v. Fulminante*, 499 U.S. 279, 296, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991). "[A] trial court would have to go to extraordinary lengths to cure the harm caused by an erroneously admitted confession. Evidence of a confession can have such a devastating and pervasive effect that mitigating steps, no matter how quickly and ably taken, cannot salvage a fair trial for the defendant." *United States v Ince*, 21 F3d 576, 583 (4th Cir. 1994).

Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Bruton v. United States*, 391 U.S. 123, 139-40, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968) (White, J., dissenting).

Without that post-*Miranda* confession at the police station interrogation, the Government did not have a case against Ray that was beyond a reasonable doubt. The Government did not have an identification of Ray selling drugs. They found a prescription bottle and some mail addressed to Ray at the Genesee house, but there was no other evidence about the extent of his contact with the residence without his statement that he had been living there for the last 10 years. The Genesee house belonged to Lee's mother, and Lee had lived there most of her life until just recently. Not only that, Lee was present during the execution of the search warrant.

Just as in *Hart, supra*, the Defense in this case had to alter its trial strategy because the confession was not suppressed. The Defense had to forgo the possibility of raising doubt by arguing that the firearms and drugs belonged to Lee and may not have called Lee to testify. The rifle in the closet belonged to Lee's mother, and the rifle found in the basement belonged to Lee's deceased uncle. Ray could still have presented evidence about the party the night before, without testifying himself, through the testimony of the witnesses who were there, in order to explain the cocaine and pistol in the front closet.

Instead, Ray was forced to take the stand to explain his false and involuntary confession and was not able to raise doubt by suggesting the police had it in for Ray once they found out he had a prior record and arrested him instead of arresting Lee and Ray together.

There is at least "a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Fahy v. Connecticut*, 375 U.S. 85, 86-87, 84 S. Ct. 229, 230, 11 L. Ed. 2d 171 (1963)).

WHEREFORE, Defendant Alvin Ray moves this Honorable Court to grant his motion to suppress the Defendant's statements, set aside the verdict, and schedule a new trial.

Date: February 12, 2016  Respectfully Submitted,

By: s/Mark H. Magidson
MARK H. MAGIDSON (25581)
Attorney for Defendant Alvin Ray
615 Griswold, Suite 810
Detroit, MI 48226
(313) 963-4311
MMAG100@AOL.COM

**CERTIFICATE OF SERVICE**

I herby certify that on February 12, 2016 I electronically filed the above *Supplemental Brief* with the Clerk of the Court using the ECF system, which will send notification of such filing to the parties of record.

                                  By: s/Mark H. Magidson
                                  MARK H. MAGIDSON (P25581)
                                  Attorney for Defendant Alvin Ray
                                  615 Griswold, Suite 810
                                  Detroit, MI 48226
                                  (313) 963-4311
                                  MMAG100@AOL.COM